[No. 27285. Department One. August 8, 1939.]

HARRY A. BROD, *Respondent,* v. GEHRI HEATING AND PLUMBING COMPANY, *Appellant,* C. A. DUNHAM COMPANY, *Respondent.*[1]

[1]Reported in 93 P. (2d) 313.

*Emil N. Stenberg,* for appellant.

*Robert B. Abel,* for respondent Brod.

*Rickabaugh & Rickabaugh,* for respondent C. A. Dunham Company.

ROBINSON, J.—Harry A. Brod, a salesman of heating and ventilating equipment for various manufacturers, and on his own account, brought this action to recover $555, the price of an electric motor. Being in doubt as to the person from whom he was entitled to recover, he joined several defendants, as permitted by subd. 2, Rule II, Rules of Pleading, Procedure and Practice,

193 Wash. 40-a. These defendants were Gehri Heating and Plumbing Company, a corporation (hereinafter referred to as Gehri), C. A. Dunham Company, a corporation (hereinafter called Dunham), and E. M. Tennant. Dunham's home office and plant are in Chicago. Tennant was the manager of its Seattle sales office.

Gehri answered, denying that it had purchased the motor. Dunham answered, also denying that it had purchased the motor, but cross-complained against Gehri for $863.93, with respect to goods alleged to have been sold and delivered. Answering the Dunham cross-complaint, Gehri set up that it had entered into a written contract with Dunham on February 1, 1936, to purchase a list of articles set out at the various prices therein stipulated; that said articles had been furnished, and that it had paid for the same, except for the sum of $224.27. As the motor, for the price of which the plaintiff sued, was one of the articles listed in this contract, Gehri further pleaded that, if the plaintiff recovered against it, then it should have a recovery over against Dunham for $555, less $224.27, or $330.73.

Replying to the Gehri answer to its cross-complaint, Dunham denied that the alleged contract of February 1, 1936, purporting to have been executed by Tennant, was its contract. It denied that Tennant had any authority to enter into any contract on its behalf to sell any material not manufactured or handled by it. It further set up that no contract made by a salesman on its behalf was valid until approved in writing by the home office. It alleged that it did furnish to Gehri, on various orders transmitted by Tennant, a list of articles of the value of $1,947.25, and had received payments amounting to $1,083.32, leaving a balance due of $863.93. It further denied that Tennant had any

authority to make collections on its behalf, or to receive payment for its goods when sold by him, and alleged that, if any payments were made to Tennant on account of goods sold by it to Gehri, they were made to him without authority and could not rightly be applied as a payment on its account.

It appears from the record that Gehri, late in 1935 or early in 1936, secured contracts to install heating systems in three public buildings. In order to perform these contracts, it had to purchase a great deal of equipment. On February 1, 1936, it addressed a letter to "C. A. Dunham Company, 1518 Exchange Building, Seattle, Washington. Atten: Mr. E. M. Tennant," as follows:

"Dear Sir:

"Confirming the verbal award of all specialties as specified for the Hoquiam, Montesano and Male Ward P. W. A. Projects according to quotation submitted us by you as listed below: [Here follows a list of articles with prices attached to each, and, including the motor, the whole amounting to upwards of six thousand dollars.]"

There are also some general provisions concerning discounts, not material to our inquiry. The letter is signed by the Gehri company. At the bottom, left, appears: "Accepted: By E. M. Tennant."

Prior to February 1st, Mr. Tennant had gotten a price from Brod on the motor, which is listed in the February 1st contract. Brod testified that, in case the sale of the motor was made, he and Tennant were to divide the resulting profits. After the instrument of February 1st was executed, Tennant sent an order to Brod's principal for the motor and some other equipment needed to fulfill the Gehri contract. This order was on a Dunham letterhead. At the bottom, as on all of the Dunham letterheads which we find among the exhibits, was printed in small, but in readable, type:

"All contracts and agreements of this company are made contingent upon strikes, accidents and other delays beyond its control, and are only binding upon the company when approved in writing by the home office."

It was for that reason, Brod testified, that he insisted that Gehri become personally responsible for the equipment that he furnished. Concerning this, Brod testified that, before he shipped the motor, he told Otto Gehri, president of the company, that he would look to them direct for payment, and that Gehri told him that he would have to get authority from Tennant. Brod said that he got such authority and telephoned Gehri, and Gehri said: "O. K." At another point, Brod testified, squarely, that Gehri told him he would pay him for the motor; that he then furnished it, and sent the invoice to Gehri. A copy of this invoice is in the record, dated October 2, 1936. A witness named Carlson testified that Otto Gehri told Brod, in his presence, in February, 1937, that there was money coming from the job and he would be responsible for payment for the motor.

Mr. Gehri testified that the motor was purchased from Dunham, and not from Brod; that he did tell Brod he would pay him direct if he got an order from Dunham through Tennant; but that he never received it, and that he paid Dunham for the motor when he completed payment of the February 1st contract, less $224.27.

It is contended that, at the most, this evidence shows but an agreement on Gehri's part to answer for the default of another, and therefore not enforcible, because not in writing. This contention is evidently based upon the testimony of Carlson that Gehri told Brod, in 1937, that he would be "responsible" for payment for the motor. However, the finding of the court is that Gehri made a direct, original promise to pay in August, 1936, before the motor was delivered. The evi-

dence to this effect, though somewhat scanty, is, in our opinion, sufficient to support the finding.

Was the February 1st contract a contract between Gehri and Dunham or between Gehri and Tennant? The contract is, in form, ambiguous; for, while Gehri's letter is addressed to Dunham, it is accepted by Tennant—not specifically by Tennant on behalf of Dunham.

It is abundantly clear from the record that Tennant had no actual authority to make such a contract for Dunham. Tennant did not treat it as a Dunham contract. He did not send it to his principal for approval. He merely sent orders to it for those items in the contract which it could supply, just as he sent the order to Brod's principal for the motor. Dunham's evidence is to the effect that it never even saw a copy of the February 1st instrument until January, 1937, although all of the goods it had furnished to Gehri had been shipped, accepted, and installed long prior to that.

It is quite easy to understand why the instrument of February 1st was not sent to Dunham by Tennant, for about two-thirds of the articles, in value, listed therein, were not Dunham's goods, and the agency agreement between Dunham and Tennant, which was introduced in evidence by both parties to the action, provides, among other things,

"It is distinctly agreed that the Second Party [Tennant] will not sell directly or indirectly any article or products other than those of the First Party [Dunham] unless first approved in writing by the First Party."

At another point in the Dunham-Tennant agency agreement, we find this language:

"The Second Party has authority only as the representative of the First Party to sell the First Party's products . . ."

It was also provided in the agency agreement that Tennant could make no contract or agreement on behalf

of Dunham without its consent in writing, and, as we have heretofore stated, notice to that effect was carried on all Dunham's letterheads, which letterheads Tennant was required to use, and did use.

The agency agreement further provided:

"Second Party shall not make collections for goods sold on contracts made hereunder, but all collections of accounts for money due First Party shall be made by First Party and it shall have exclusive charge and control of same, except in special cases wherein the First Party authorizes in writing the collection of certain accounts."

It is, therefore, clear that Tennant had no actual authority to make any such contract for Dunham as the alleged February 1st contract, and also that he had no authority to make collections.

■ As between Gehri and Dunham, however, it is the agent's apparent authority which controls. Did Dunham hold out Tennant as being authorized to make such a contract? Appellant points out that "Dunham C A Co Exch Bg EL iot-1894," appears in the Seattle telephone book, and that there is a similar listing in the Seattle directory. He also introduced a photograph of the entrance door to 1518 Exchange building, upon which appeared, at the top, the following: "Percy S. Laing Shipping Company, Inc., Steamship Agents, Brokers & Fruit Forwarders;" below that, "Griffith Transport Company," and below that, "C. A. Dunham Co."

The maintenance of these listings and the presence of the name on the office door were known to Dunham; in fact, its contract with Tennant required them. This is substantially the only evidence in the record relied upon to show apparent authority in Tennant to make the sort of contract alleged. The fact seems to be that, in making the alleged contract, Otto Gehri, acting for

his company, relied wholly upon Tennant's statements that he was Dunham's agent, and assumed that, as such agent, he had authority to make such a contract for his principal. We quote from the cross-examination of Otto Gehri, who, as president of Gehri, negotiated the alleged contract:

"Q. You introduced Defendant's Exhibit 2 which I put in as an exhibit in your answer, and you claim is the contract on which you are relying to hold C. A. Dunham Company? A. Yes, sir. Q. How is that acceptance signed? A. By Mr. Tennant. Q. As manager, or agent for C. A. Dunham Company? A. No, sir. Q. You have no acceptance of any kind from C. A. Dunham Company? A. This is addressed to C. A. Dunham Company. Q. But you have no acceptance? A. No, sir. Q. Only by Mr. Tennant individually? A. Whom I considered their agent. Q. You stated you never were in their office at Seattle? A. No, sir. Q. And never saw their letterheads? A. Not that I recall. Q. Then you are relying entirely upon Mr. Tennant's authority to represent C. A. Dunham Company by his statement to you that he was manager? A. Yes, sir."

Mr. Gehri's testimony on his direct examination was as follows:

"Q. Mr. Gehri, you had a conversation with Mr. Tennant as to his relation with the C. A. Dunham Company? A. Yes. Q. What did he say his relationships were? A. He was a salaried employee."

Subsequent acts of Gehri are inconsistent with the claim that it thought that the February 1st contract was Dunham's. On July 15, 1936, Dunham, having filled the orders sent in by Tennant, wrote Gehri a rather sharp letter concerning the nonpayment of its account. On July 25th, Gehri sent Dunham $1,083.36. Dunham acknowledged it, and stated that $191.18 was still due, and they would expect it by August 15th. On September 18th, Dunham complained, by letter, of not

having received this amount. Answering that letter on September 22nd, Gehri said, in part:

"Answering your letter of September 18th with reference to the $191.18 balance. This balance is on the Hoquiam School job which we have completed and have certificate of acceptance on and have made application for full settlement which we expect in the very near future and will remit in full at that time."

On October 27th, Dunham wrote, complaining that it had not received the $191.18, and on November 9th, that it received neither the money nor an answer to its letter of October 27th. Yet, Gehri now shows, in its evidence in this case, that it paid Tennant $579 on July 6th, and says that this was a payment to Dunham. If that is so, it owed no balance of $191.18 all those months, and, in fact, it had overpaid Dunham when it sent $1,083.36 on July 25th.

When, finally, Gehri began claiming, late in 1936, that it had such a contract, Dunham had a great deal of difficulty in getting Gehri to furnish it a copy. Relative to this, Mr. Gehri testified:

"Q. Why do you say you were reluctant to tell C. A. Dunham Company what your contract was? They wrote you after you had some trouble on stuff furnished by Mr. Tennant and you wanted C. A. Dunham Company to make it right, and they had to write several times before you told them. A. I think if we had Mr. Tennant here we could clear this thing up. Q. Why didn't you tell C. A. Dunham Company? A. Because we realized that Mr. Tennant was going 'South' with the money, and we wanted to close the jobs before they filed a lien."

There is a great deal in the record from which an inference can be drawn that the claim of Gehri that the February 1st contract was with Dunham was an afterthought. However that may be, we are of the opinion that there is not sufficient proof of holding out to hold

Dunham—nothing more than its name on the office door and in the directories, and whatever inference might have been drawn from that by Gehri is weakened by the fact that Otto Gehri testified that he knew that Tennant was a mere salaried employee.

In any event, and even if Tennant had the right to, and did, make the contract on the part of Dunham, Gehri had no right to assume that Tennant was authorized to receive the payments to become due thereunder. Such authority is not implied from the right to sell, unless the agent is entrusted with possession of the goods; which was not the case here.

In *Petersen v. Pacific American Fisheries,* 108 Wash. 63, 183 Pac. 79, 8 A. L. R. 198, this court quoted, with approval, the following from 1 Am. & Eng. Ency. Law (2d ed.), 1014:

" 'Where the principal has clothed the agent with the *indicia* of authority to receive payment, as by entrusting him with the possession of the goods to be sold, the purchaser is warranted in paying the price to the agent at the time of sale. But when the agent has not the possession of the goods, and no other *indicia* of authority, and is only authorized to sell, the purchaser pays the agent at his peril, and it devolves upon him to show that the agent was authorized to receive payment'."

See the elaborate note on the *Petersen* case in 8 A. L. R. 203, entitled, "Authority of Agent to Receive Payment for Commodities Which He Is Authorized to Sell or for Which He is to Find Market," and the continuation thereof in 105 A. L. R. 718.

In a later case, decided by this court (*Woodworth v. School Dist. No. 2,* 92 Wash. 456, 159 Pac. 757), it is said:

"The court was also requested to instruct the jury that an agent employed to make sales, and selling on credit, is not authorized to subsequently collect the

price in the name of the principal, and payment to him will not discharge the purchaser unless he can show some authority in the agent other than that necessarily implied in a mere power to make sales. This instruction also should have been given in order that the jury might be advised that, if they found that Jansson had no apparent authority other than to make sales, payment to him would not discharge the debt."

■ There is some contention made that Dunham ratified the alleged contract by supplying the goods, and that it is even now, in prosecuting its cross-complaint, seeking to take the benefit thereof. But, as we have heretofore pointed out, Dunham had no knowledge of the existence of any such instrument until after the goods had been forwarded in accordance with Tennant's orders, accepted by Gehri, and installed in the buildings. It could not, by conduct, ratify an instrument of which it had no knowledge.

Nor is Dunham now attempting to reap the benefit of the contract. It disavowed the contract utterly when it first received knowledge of it. In its cross-complaint, it alleged that it furnished Gehri goods and merchandise of the value of $1,947.25; that it had received $1,083.32 on the account; and that $863.93 was still due. The trial court so found, and we think its findings are supported by the evidence.

The judgments appealed from are affirmed.

BLAKE, C. J., MAIN, JEFFERS, and STEINERT, JJ., concur.